# UNITED STATES DISTRICT COURT
### for the
Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>508 Welder Street, East Spencer, North Carolina<br>including additional structures located on or within the<br>curtilage and any vehicles present | )<br>)<br>)<br>)<br>)<br>) Case No. 1:21MJ57-1 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

508 Welder Street, East Spencer, North Carolina including additional structures located on or within the curtilage and any vehicles present, as further described in Attachment A.

located in the _____ Middle _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized):*

Evidence of dog fighting in violation of 7 U.S.C. § 2156, as further described in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 7 U.S.C. § 2156 | Animal Fighting Venture Prohibition |

The application is based on these facts:
See the attached affidavit of USDA Agent George Moore

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/S/ George Moore 02/11/2021
_____
*Applicant's signature*

George Moore, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 02/11/2021  12:58pm _____

City and state: _____ Durham, North Carolina _____

_____
*Judge's signature*

Joe L. Webster, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, George Moore, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing a search of 508 Welder Street, East Spencer, North Carolina (hereinafter the "SUBJECT PREMISES") which is located in the Middle District of North Carolina. I submit this application and affidavit in support of a search warrant authorizing a search of the SUBJECT PREMISES as described in Attachment A for the items described in Attachment B, to include live animals (dogs) that are evidence, fruits, and instrumentalities of animal fighting venture crimes. I request authority to search the SUBJECT PREMISES for the items described in Attachment B, and to seize all items listed in Attachment B as evidence, fruits, and instrumentalities of crime.

2.      I have been employed as a Special Agent with the United States of Agriculture (USDA), Office of Inspector General (OIG) since March 2020. Prior to my employment with USDA, I was a Special Agent with the Internal Revenue Service (IRS) - Criminal Investigation for over five years, during which I investigated tax and other financial crimes. I worked with the IRS for over ten years in total dealing with criminal and civil matters. Before my federal service began in 2009, I served as a police officer with the East Carolina University Police Department in Greenville, North Carolina, and was promoted to Sergeant, where I supervised approximately ten sworn and non-sworn personnel. In my capacity as a police officer, I enforced criminal laws within my jurisdiction and used various techniques to investigate crimes.

1

3. I have attended training in various aspects of criminal investigations at the Federal Law Enforcement Training Center and the National Criminal Investigation Training Academy for Internal Revenue Service Special Agents, both located in Glynco, Georgia. I attended training in evaluating electronic sources of information and conducting investigations in a cyber-environment. In addition, I attended training on the use of social media in investigations. I earned a Bachelor of Science in Business Administration with a concentration in accounting in 2004 and a Master in Accounting in 2009, both from East Carolina University. I am a licensed Certified Public Accountant in the State of North Carolina.

4. As part of my duties as a Special Agent, I investigate matters involving illegal animal fighting. I have participated in investigations of such crimes, and I have received specialized training in the investigation of animal fighting and related Title 18 offenses. Through training, I am familiar with the actions, traits, habits, and terminology used by handlers or owners of dogs involved in animal fighting ventures.

5. I am familiar with the facts set forth herein based on my personal observations and information provided to me by other law enforcement personnel participating in this investigation. I am also familiar with the facts set forth based on my review of documents, reports, photographs, and video files.

6. As the purpose of this affidavit is only to establish probable cause to support the issuance of search and seizure warrants, I have not set forth each and every fact known concerning this investigation. Where statements of others are set forth in this affidavit, they are set forth in substance and in part. In addition, the events described in this affidavit occurred on or about the dates provided herein.

2

## LEGAL AND FACTUAL BACKGROUND ON ANIMAL FIGHTING VENTURES

7.      The federal Animal Welfare Act defines "animal fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment." 7 U.S.C. § 2156(g)(1). It is illegal to sponsor or exhibit an animal in an animal fighting venture. 7 U.S.C. § 2156(a)(1). It is also illegal to possess, train, sell, buy, transport, deliver or receive an animal for purposes of having the animal participate in an animal fighting venture. 7 U.S.C. § 2156(b). Each of these offenses are felonies punishable by up to five years in prison. 7 U.S.C. § 2156(j); 18 U.S.C. § 49.

8.      The Secretary of Agriculture is authorized to enforce the Animal Welfare Act, which provides that "the Secretary or any other person authorized by him shall make such investigations as the Secretary deems necessary to determine whether any person has violated or is violating any provision of this section." 7 U.S.C. § 2156(f).

9.      The Animal Welfare Act states, "[a] warrant to search for and seize any animal which there is probable cause to believe was involved in any violation of this section may be issued by any judge of the United States or of a State court of record or by a United States magistrate judge within the district wherein the animal sought is located." *Id.* Any animal "involved in any violation of this section shall be liable to be proceeded against and forfeited to the United States" in either a civil or criminal proceeding. *Id.*; 28 U.S.C. § 2461.

10.      The remaining paragraphs in this section of the affidavit are based on my training investigating animal fighting ventures, and on information provided to me by other law enforcement personnel. In the United States, dogfighting ventures often involve "pit bull"-type dogs, which dogfighters prefer for their compact muscular build, short coat, and the aggression

3

that some display toward other dogs. A dogfight occurs when two dogs are knowingly released by their handlers in a controlled environment to attack each other and fight. The fight ends when one dog withdraws, when a handler "picks up" their dog and forfeits the match, or when one or both dogs die.

11.     Because of their conditioning and training, dogs used in animal fighting ventures are housed separately from other dogs – in pens, cages, or on chains – so that they will not hurt or kill other dogs when the handler is absent. Heavy chains are often used when restraining dogs to develop neck strength in dogs used for fighting purposes.

12.     Dogfighters fight dogs with a goal of obtaining "Champion" or "Grand Champion" status for their dogs, which is achieved by winning three or five fights, respectively. They maintain contact with other dogfighters around the country and can generate substantial income from gambling on dogfights and from the sale and breeding of fighting animals.

13.     Dogfighters select the strongest, most capable fighting dogs and selectively breed, sell, and fight only those dogs that display particular traits. Some of these traits are: (1) "gameness" or aggressiveness and propensity to fight other dogs; (2) a willingness to continue fighting another dog despite traumatic and/or mortal injury; and (3) cardiovascular endurance to continue fighting for long periods of time and through fatigue and injury. Dogs displaying these attributes are often bred with other dogs displaying similar traits to enhance the "bloodline" of these dogs for fighting purposes.

14.     The most common way that a dogfighter tests a particular dog to ascertain whether the dog is "game" is to "roll" the dog. A "roll" is a dogfight conducted for purposes of "game-testing" rather than for wagering. "Roll" fights generally last from five to fifteen minutes, at which point the handlers usually stop the fight. However, "roll" fights can result in serious injury or death to one or both dogs.

4

15.     Not all dogs in a litter of puppies bred from fighting dogs will show inclination to fight. Dogfighters refer to dogs who do not demonstrate fighting instinct by the time they reach maturity as "cold" or "shy." Because such dogs have no value to a dogfighting operation, they are often culled, to use a word employed by dogfighters. To avoid public scrutiny, dogfighters typically do not sell these dogs to non-dogfighters or take them to an animal shelter. "Culling" generally results in the death of these animals. Federal agents are aware of dogfighting targets and defendants having killed dogs by shooting them, strangling them, bludgeoning them, or drowning them.

16.     It is a common practice for those involved in training and exhibiting fighting dogs to possess several dogs at one time. This practice is followed for several reasons. First, dogfighters maintain a stock of dogs at different weights and both sexes because, in dogfights, dogs are matched against other dogs to within a pound of the same weight against dogs of the same sex. Maintaining a stock of several dogs thus increases the odds of owning a dog whose weight meets the requirements for a match solicited by an opponent. Second, dogfighters also maintain multiple dogs in order to selectively breed, sell, and fight dogs displaying certain traits or to otherwise advance a particular dogfighting "bloodline."

17.     Further, dogfighters must possess an inventory of dogs because dogs often die or are badly injured during fights. Possessing multiple dogs also increases the prospects of owning a dog who will become a Champion or Grand Champion. Dogfighters also routinely test and "roll" their dogs, including against their own dogs.

18.     Dogs that lose fights or fail to show "gameness" are often killed. It is not uncommon for dogs that lose matches to be killed in cruel, torturous, and inhumane ways as punishment.

19.     Dogfights typically involve consistent practices leading up to and during the fight. Fighting dog owners or handlers enter into a verbal or written contract with their opponent several

5

weeks before the dogfight, often referred to as a "match" or "show." The owners or handlers agree upon: (1) the sex and weight of the dogs at the time of the fight; (2) the geographic area in which the fight will occur (the exact location of which is often a guarded secret until shortly before the fight); (3) a referee; (4) the payment of "forfeit" money that is lost if one participant pulls out of the match or if a participant's dog does not arrive at the agreed-upon weight; and (5) monetary wagers placed by the respective fighters.

20. It can be challenging for dogfighters to find an opponent with a dog of the same weight and sex who is looking to fight that dog at the same time of year, and for a wager that is mutually agreeable to both parties. For that reason, dogfighters rely heavily on each other and on extensive networks of contacts to find an opponent who has a dog of the same weight and sex and who is looking to fight that dog at the same time of the year. The practice is known as "calling out a weight." Dogfighters often "call out a weight" to known dogfighters in several states, to increase their odds of finding a match. "Calling out a weight" is done by telephone, text message, e-mail, or other electronic communication. It is an integral practice without which many dogfights would not occur.

21. Once a dogfighter locates an opponent and agrees upon terms, the match is "hooked," or set up. The dog then undergoes a conditioning process that dog handlers refer to as a "keep. A "keep" is typically conducted for six to eight weeks before the scheduled match and involves a training program including: treadmills used to run and exercise the dogs away from public view; weighted chains and pulling devices used to increase the dog's strength and stamina; the use of devices such as "spring poles" and "flirt poles" to build jaw strength and increase aggression; water-based training such as tethering a dog to a cable running across a pool; and the administration of drugs, legal and illegal, including steroids to build muscle mass and aggression.

6

22. Dogs matched for future fights are expected to achieve their established target weight by the scheduled match, much like in human boxing matches, requiring close attention to a dog's routine. Training can take place in a dogfighter's "yard" or indoors away from public view, such as in a basement.

23. Although dogs used for fighting are often housed outside, as the match date approaches, a dog in a keep may be housed indoors or near the owner/handler for several reasons. One reason is to prevent the dog from becoming sick or injured by other dogs before the match, which could cause the dog to forfeit and the owner to pay a forfeit fee. Another reason is that dogs in a keep require constant exercise and monitoring, which is easier when the dog is in close vicinity rather than off-site or outside. Dogs intended for fighting purposes are also often housed inside residences if they are injured, ill, pregnant, weaning, or if a dogfighter does not have another location to keep them or wants to keep them out of view.

24. Dogfighters sometimes breed their own fighting dogs from dogs they already own, and sometimes buy fighting dogs from other dogfighters, either as adult dogs or puppies. When dogfighters acquire dogs from other dogfighters, they sometimes do so in order to integrate desired fighting traits or "bloodlines" from other dogfighters into their own stock.

25. Some dogfighters are selective about who they will sell fighting dogs to, because the success of that dog in the fighting ring will reflect on the seller whose "bloodline" is represented by the dog. A dog that produces multiple offspring that go on to be "Champions" (*i.e.*, winning three or more dogfights) is bestowed the "Register of Merit" ("ROM") or "Producer of Record ("POR") title. This provides incentive to the seller to sell dogs to capable dogfighters, with the intention that the dogs will be fought.

26. It is common for those operating dogfighting ventures to maintain "pedigrees," books, records, ledgers, and journals relating to the possession, purchase, transportation, sale,

7

breeding, and training of fighting dogs. These materials exist in both hard and electronic copy. The "pedigree" of a fighting dog shows the dog's name, with reference to the dogfighting "kennel," as well as breeding lineage going back multiple generations, with references to the number of fights won by that dog and its predecessors. Pedigrees are important in the dogfighting "industry" because they allow dogfighters to maintain information on whether a particular "bloodline" or breeding combination resulted in desired fighting traits. Dogfighters also often maintain ledgers and journals that specifically depict how certain dogs performed during a particular fight, together with the duration and outcome of fights.

27.    Underground dogfighting publications similar to magazines are routinely published and distributed to readers through periodic subscriptions, which describe and report on recent fight details and past results from around the country using coded language. They also describe various "kennels" or dog breeders who raise dogs for animal fighting purposes. In addition, there are online and electronically distributed versions of published magazines that serve the same purpose.

28.    Dogfighters today tend to communicate with each other via phone, text messages, social media, e-mail, or website chat rooms dedicated to "game dogs." Dogfighters routinely set-up matches and exchange documents, expertise, photographs, or videos relating to dogfighting activities via text message and other electronic means. Dogfighters exchange photographs and videos of dogs, for example, to demonstrate a dog's conformation or build, gameness, and other fighting qualities, when soliciting or advertising a dog for purposes of buying, breeding, or arranging a fight.

29.    Dogfighters also post dog pedigrees on the website http://www.apbt.online-pedigrees.com, known as "Peds Online" or "Online Peds." Dogfighters use this as a repository for breeding information to prove, verify, and research the lineage of their dogs or dogs they are fighting against or considering buying or breeding to. The pedigree for each dog contains: an

8

indicator of how many fights the dog has won, whether the dog is a "Champion" or a "Grand Champion," the breeding history of the dog going back four generations, and indicators of the number of fights that dogs in their "bloodline" have won. There is also a field for "Breeder" and "Owner." Some pedigrees have pictures of the dogs. Each pedigree has a unique six-digit number that appears in the webpage internet address for that particular pedigree.

## **PROBABLE CAUSE**

30.    Based on the information detailed in this affidavit, I have probable cause to believe Moore engages in illegal dogfighting activities and also breeds, possesses, trains, transports, receives, sells, and/or delivers dogs for participation in animal fighting ventures from the SUBJECT PREMISES also known as his residence, and elsewhere, and has conspired with others to do the same. I have probable cause to believe that evidence of a crime, fruits of a crime, and instrumentalities of violations of 7 U.S.C. § 2156 (animal fighting) are located at and inside the SUBJECT PREMISES, which is located in the Middle District of North Carolina, and further described in Attachment A.

### **Cabarrus County Dogfighting Investigation into Moore**

31.    In March 2018, the Cabarrus County Sheriff's Office (CCSO) investigated Moore for dogfighting and animal cruelty. CCSO provided various incident/arrest reports and search warrant information regarding an investigation into Moore for dogfighting and animal cruelty. I reviewed the materials as part of my investigation and include a brief summary of the investigation as follows:

32.    On March 10, 2018, the CCSO's Animal Control Division was dispatched to the area of 320 Sign Drive in Concord, North Carolina, for an animal welfare check. CCSO met with the complainant who was off-roading in the area and observed a large group of dogs across a large

9

creek/river type area. The dogs were chained and had shelter but the complainant was concerned as to why the dogs were in the area with no homes or owners within sight. CCSO counted 10+ dogs from view across the creek/river type area who appeared to have suitable shelter at the time.

33.     CCSO thereafter conducted various welfare checks of the area. During these checks, CCSO observed indicia of dogfighting including that many of the pit bull-type breeds on the property appeared to have scarring on their muzzle area with different stages of scarring. Scarring associated with organized dogfights is primarily concentrated on the front legs, head, and muzzle area. Dogs trained for dogfighting are trained and conditioned to attack repeatedly in specific areas of their opponent.

34.     CCSO also found several syringes, empty vaccine packets, a dewormer container, and a multi-vitamin container in the area. Dogfighters commonly give dogs vitamins, supplements and drugs for conditioning in preparation for a fight and to incite the dogs to fight. It is also common for dogfighters to have veterinary supplies as most dogfighters do not take their animals to a veterinarian for treatment for fear of exposure. CCSO also found a rope attached to a spring/hook type contraption; it appeared to be a variant of a spring pole, which is a tool commonly used to train dogs for bloodsport.

35.     During one of the welfare checks, a man approached the property and identified himself as "D" Moore. CCSO recognized the man as Delontay Moore. Moore was concerned that the deputies were "taking his dogs." CCSO asked if the dogs chained up in the area were his and Moore responded that the dogs were his.

36.     Arrest warrants for Felony Cruelty to Animals (North Carolina General Statute 14-360 (B)) and Dogfighting (North Carolina General Statute 14-362.2(B)) were issued for Moore. A search warrant was executed on the property on June 7, 2018. Fourteen Rottweiler and pit bull-type dogs, fourteen chains, a flirt-pole, and a partial spring-pole were seized from the property.

10

Moore was arrested on the property during the execution of the search warrant. The fourteen dogs were forfeited at a later date by a North Carolina Superior Court Judge. Charges related to evidence found during the search warrant are pending in the North Carolina Judicial System.

**March 2020 Incident and Evidence of Dogfighting**

37. The Concord Police Department (CPD) provided various incident/arrest reports and search warrant information regarding an investigation into Moore, which led to further evidence of Moore's involvement in dogfighting. I reviewed the materials as part of my investigation and include relevant information as follows:

38. On March 10, 2020, CPD responded to gunshots fired at a residence in Concord, North Carolina. The victim explained that gunshots were fired into her occupied residence and Moore had been threatening her. The victim told officers that she heard gunshots and observed Moore's truck leaving the area. The victim stated that Moore had a distinct dog crate in the back of his truck. Traffic footage near the shooting corroborated the victim's description of Moore's truck. Arrest warrants were secured for Moore related to Possession of a Firearm by a Convicted Felon (North Carolina General Statute 14-415.1) and Discharging a Firearm into an Occupied Property (North Carolina General Statute 14-34.1).

39. On March 18, 2020, CPD requested that the Rowan County Sheriff's Office (RCSO) assist in locating and apprehending Moore. Law enforcement officers from CPD and RCSO traveled to the SUBJECT PREMISES to locate and arrest Moore. A red Ford F-150 was in the yard of the SUBJECT PREMISES and appeared to be the same one described by the victim as leaving the area of the shooting that happened on March 10, 2020. Moore was living at the residence and apprehended.

11

40.     RCSO secured the SUBJECT PREMISES while a CPD detective traveled to apply for a search warrant based on the smell of marijuana coming from the SUBJECT PREMISES. While waiting for the search warrant, officers took outdoor photographs of the property.

41.     Officers saw numerous dogs either caged or tied up on the property of the SUBJECT PREMISES. Officers took photographs of a tan pit bull type-dog that was tied to a tree by the driveway and that appeared very malnourished with a severely infected left ear. This dog also had several open and older wounds on its neck, face, and rear legs. These types of wounds are often observed in dogs that have been used for dogfighting. Officers observed and photographed several other dogs. One dog appeared to be a large pit bull-type dog, and that dog had feces in both his cage and food bowl. Another dog had several old wounds on its neck and right leg area. The wounds appeared as small round shaped wounds consistent with puncture wounds.

42.     Officers also noticed that the door to the detached concrete garage located at the SUBJECT PREMISES was partially open and they saw several cages inside the garage. The cages were positioned in an octagon, much like a mixed martial arts arena.

43.     The CPD detective returned with a search warrant for the SUBJECT PREMISES and officers executed it on the same day.

44.     During the execution of the search warrant, officers saw several more dogs in an enclosed porch area attached to the house. The dogs were in cages and some of the cages had several dogs in them. The cages did not appear big enough to hold the dogs, and in some cases, the dogs did not even have enough room to turn around.

**USDA Becomes Involved**

45.     On December 19, 2019, Moore was arrested by CPD for Possession of a Firearm by a Convicted Felon (North Carolina General Statute 14-415.1). During the course of its

12

investigation, CPD obtained a warrant to search a residence associated with Moore in Concord, NC and to seize evidence of drug trafficking, including cellular telephones. The area searched is not the SUBJECT PREMISES in which this this affidavit is made. One of the phones seized was a red and black Apple iPhone with International Mobile Equipment Identity (IMEI) serial number 356426100788485. A subsequent search warrant was secured by CPD to search the iPhone's contents and a Cellebrite Extraction (extraction) was produced.

46. CPD reviewed the extraction for potential evidence of possession of a firearm by a felon and possession with intent to sell/deliver marijuana as outlined in the search warrant. The search revealed evidence of firearms and narcotic activity. The search of the extraction also revealed evidence of dogfighting. Specifically, CPD observed, in plain view, photographs and videos of pit bull-type dogs fighting, while a person who sounds like Moore agitates or incites them. After observing the aforementioned dogfighting videos in plain view on Moore's cell phone, CPD first contacted RCSO because RCSO has jurisdiction in East Spencer, North Carolina, where the videos appeared to be taken. Through further investigation, RCSO noted that the house located on the SUBJECT PREMISES appeared consistent with the house featured in the dogfighting videos. RCSO conducted a drive-by of the location and saw 10-15 dogs that appeared to be pit bull-type dogs in kennels or on log chains.

47. . RCSO contacted USDA-OIG to assist with the dogfighting investigation. I met with RCSO on April 23, 2020, to discuss Moore and his connection to dogfighting. RCSO and I conducted a drive-by of the SUBJECT PREMISES on the same date. From the street, I observed approximately 10 dogs at the residence either tied up, in kennels or in wood dog boxes.

48. I obtained incident/arrest reports, search warrant information, photographs, videos and other types of information from RCSO and CPD on April 23, 2020, to evaluate evidence of dogfighting related to Moore. I met with CCSO on June 18, 2020, to discuss Moore and his

13

involvement with dogfighting. CCSO provided incident/arrest reports, search warrant information, photographs, videos and other types of information during the meeting. Some of these incidents have been described above.

49. On August 2, 2020, I conducted a drive-by of the SUBJECT PREMISES. I observed 5-7 pit bull-type dogs in kennels or wood dog boxes along with 2 bully mix-type dogs walking around the property. A burgundy Ford F-150 and a burgundy Ford sedan were parked on the property and appeared to be the same vehicles in photographs from the March 18, 2020, arrest of Moore, and search of the SUBJECT PREMISES. I saw a man, who appeared to be Moore based on my review of jail booking photographs, standing at the rear of the residence in between the house and detached concrete garage. Moore cautiously watched my vehicle as I turned around on the narrow Welder Street and drove past his residence once more. Moore walked toward the front of the residence and watched as I turned off Welder Street.

50. Although a state search warrant was issued to produce and review the extraction from Moore's iPhone seized by CPD on December 19, 2019, I obtained a federal search warrant to expand the investigation and search the extraction for evidence of a crime, fruits of a crime, and instrumentalities of violations of 7 U.S.C. § 2156 (animal fighting). On October 22, 2020, the Honorable United States Magistrate Judge Joi Elizabeth Peake issued a Search and Seizure Warrant to review the extraction for evidence of dogfighting.

51. On February 8, 2021, I conducted a drive-by of the SUBJECT PREMISES. I observed several wooden dog boxes, fence kennels and dog houses with approximately 15 pit bull-type dogs located in the dog enclosures. Two bully mix-type dogs were located on the front porch of the SUBJECT PREMISES. A burgundy, newer 4-door Ram truck was backed in toward the porch of the SUBJECT PREMISES. A dog crate was located in the bed of the Ram truck.

**Review of Moore's iPhone**

14

52.     I reviewed the extraction and found evidence of Moore's involvement in dogfighting. I also found evidence that the iPhone from which the extraction was pulled belonged to Moore. Specifically, the Apple ID associated with the iPhone is delontaymoore@yahoo.com and the phone number associated with the iPhone is 1 (704) 783-5580. The same phone number is listed under Moore's criminal offender records from North Carolina.

53.     Moore used his iPhone to communicate and transmit various images and videos related to dogfighting. Specifically, Moore used short message service (SMS) text messages, iMessage, WhatsApp and other services to communicate and transmit evidence of dogfighting. The various communication methods capture the sender and recipient messages either by their phone number, name, or username depending on the service. The conversation excerpts presented below are displayed using identifiers presented from the respective application on Moore's phone.

**Conversations Evidencing Involvement in Dogfighting**

54.     Moore regularly exchanged dog pedigree information using various communication methods such as the one presented below. I retrieved this pedigree information on January 5, 2021 using a web link that Moore sent in a WhatsApp conversation to 14043577016@s.whatsapp.net on December 8, 2019. Moore communicated frequently to this

15



55. The pedigree of a fighting dog shows the dog's name, with reference to the dogfighting kennel, as well as breeding lineage going back multiple generations, with references to the number of fights won by that dog and its predecessors. As explained, this is very important in the industry as it shows the bloodline and traits of the dog. The pedigree shown has "GR/CH" listed for two dogs in the fourth generation column. The abbreviation "GR/CH" is for the title grand champion which is achieved by the dog winning five fights.

56. Moore exchanged several pictures and videos of puppies and adult dogs. Some of the videos included young puppies fighting each other in their caged area.

57. The contact 1-919-548-9006 sent Moore a video depicting severed dog heads on November 16, 2019. Specifically, the video appears to show two dog heads removed from their body in various forms of decomposition. One of the heads still has the facial fur of the dog still attached. The conversation between Moore and 1-919-548-9006 indicate littermates killed the

16

dogs and started eating the dead dogs. Dogfighters often kill unwanted dogs in cruel, torturous and inhumane ways. The following is a screenshot from the aforementioned video:



**Moore "Hooked" his Dog**

58.      In a text conversation on October 29, 2019, Moore told one of his contacts that he "hooked" a dog. I know from my training and experience that a hook in the dogfighting industry means that you set up a fight for your dog. Moore also asked another contact what he needs for a "keep." I know from my training and experience that a keep involves a nutrition regiment and training program to best prepare the dog for the dogfight. It is typically conducted for approximately six to eight weeks before the scheduled dogfight.

59.      On October 29, 2019, Moore sent the following messages:

a.   Excerpt SMS conversation between phone number 1-307-251-2673 and Moore

> **Moore**: *So in your mind what is everything I need for a keep food and things I will need 2 use*

17

b. Excerpt of SMS conversation between phone number 1-404-357-7016 and Moore

> **Moore:** *Man I need some help got my boy finally hooked what's all my feed and need for this keep*

60.     I know from my training and experience that individuals involved in criminal activity will talk in coded language in an effort to disguise the nature of the illegal activity. In the excerpt below, I believe Moore is using coded language to tell another contact that he hooked a dog. Moore then asked the contact for a price for the supplies needed to prepare the dog for the fight.

a. On October 29, 2019, Moore sent and received the following messages:

> **Moore:** *I got a car in the shop can u please give me a price on everything i need idk what 'm doing get money out for it today*
>
> **Contact:** *Same thing I'm saying ya need in my opinion. it's 137 plus 8.00 shipping the worm pills is 50 for 10 and the muscle stuff is 36*
>
> **Moore:** *That's it nun more*
>
> **Contact:** *No sir that's all I can think of*

b. I believe the phrase "car in the shop" is code for hooking a dog. The contact provides a price for worm pills and "muscle stuff." Dogfighters commonly give dogs supplements for conditioning in preparation for a fight.

**Moore Fights a Dog**

61.     Approximately six weeks after indicating he "hooked" his dog, it appears, based on various communications captured on his phone, that Moore participated in a dogfight on December 7, 2019, and his dog lost.

a. The below excerpted conversation between Moore and an unidentified contact indicate that Moore fought a dog on December 7, and lost.

18

12/6/2019

    **Moore**: *He say it's on*

12/8/2019

    **1-919-548-9006**:



**1-919-548-9006**: *That group is too hot for that*

**Moore**: *Idk man give me couple days shoot u 50 back*

**1-919-548-9006**: *Naw bro that's part of it. It's a gamble*

**1-919-548-9006**: *Remember I told you. Good dogs lose too*

**Moore**: *Man I thought about it I'm happy with the out come for my first time did my thing  I know my eye for a bulldog is good*

**1-919-548-9006**: *You should be happy bro. Your hound did good. Sometimes you just run into a better one or one that has a style that can beat you. It takes time to get it all the way together. You're on track. Keep scratching*

b. Based on my training and experience, I believe that on December 6, Moore told his contact that the dogfight is still going to happen, that a fight was held on December 7, and that Moore's dog lost. Early on the morning of December 8 the contact sent

19

Moore a Facebook screenshot that displays "Congratulations to TIGF kennels 1.24 over OYA kennels." Based on the screen shot I believe Moore is associated with OYA kennels and his dog lost after one hour and 24 minutes of fighting. I know from my training that a dogfight lasts about one to two hours and ends when one of the dogs cannot continue. Dogfighters keep track of the fight time and boast to other dogfighters about the length of the fight. Furthermore, Moore said he would pay the contact back his $50 but the contact did not press for the money. Spectators of dogfights regularly gamble and wager money on a particular dog. The wagers can be minimum or upwards of thousands of dollars. The contact appeared to console Moore about his dog losing and praised Moore on how his dog fought.

c.  Another conversation using Facebook Messenger between Moore and another contact provides further evidence that Moore participated in a dogfight December 7, 2019. Based on this conversation, excerpted below, it appears Moore brought two dogs to the December 7 fight and had used an unknown person – "James" – to help prepare the dogs for the fight. The contact encouraged Moore on the day of the fight to "give them hell." The contact then checked in with Moore December 8 to see how the dogs performed. Moore told the contact that his dog lost and died on the way back home.

12/7/2019:

> **Contact:** *Give them hell....James did the work on him right*
>
> **Moore:** *Yes sir look at lil one more time then his time wanted him 2 age*
>
> **Contact:** *Okay let me know how both do*

12/8/2019:

> **Contact:** *How you do last night*

20

**Moore:** *James no good*

**Contact:** *The work was fucked up*

**Moore:** *Dog locked up*

**Contact:** *Damn*

**Contact:** *Did you bring him home*

**Moore:** *Died otw home*

**Moore:** *Tried give jame credit he still back yard not fast lane he need more rest*

**Contact:** *Okay damn*

**Moore:** *He got 2 get out there put that work in like u mill can't be it*

**Contact:** *That's right*

d. A third conversation, excerpted below, offers further evidence that Moore participated in a dogfight on December 7. Another contact asked Moore how his dog did and Moore told the contact that his dog lost. Moore told the contact that his dog lost after 1 hour and 24 minutes of fighting.

12/8/2019

**1-704-615-2296:** *How did you do.*

**Moore:** *Lost over worked*

**1-704-615-2296:** *Damn*

**Moore:** *Hour 24*

**1-704-615-2296:** *24hour*

**Moore:** *Hour 24 mins*

**1-704-615-2296:** *Shit*

**1-704-615-2296:** *Bro next time let me help you*

21

e.  It is my opinion that a fourth conversation, excerpted below, is a coded discussion about the performance of Moore's dog in the fight that took place on December 7, and the preparation of that dog for the fight.

12/8/2019:

> **1-404-357-7016:** *Damn. U pick up game at game stop? Or did motor stop?*
>
> **1-404-357-7016:** *U rather work less than work more or check wont be right at work*
>
> **Moore:** *Motor gave in*
>
> **1-404-357-7016:** *Damn*
>
> **1-404-357-7016:** *U gotta tune car yourself man. Shit not hard*
>
> **1-404-357-7016:** *Just dedication*
>
> **Moore:** *Damn man I got 2 tighten up*
>
> **1-404-357-7016:** *It's all g. How it goes sometimes. At least u out there*
>
> **Moore:** *Yea just nun like yo own shit y I'm happy I got y'all*
>
> **1-404-357-7016:** *We'll get it going 4sure bruh. It's looking up*
>
> **Moore:** *O yea got more wanting his spot time me work on my keep one dog at a time*
>
> **Moore:** *His dog will never go back out just I was 2 worked took 2 k9 with me mf was had mouth close whole time body gave out in hold*
>
> **Moore:** *My eye for a bulldog there but got 2 pick up on my work game*
>
> **1-404-357-7016:** *Yessuh*
>
> **1-404-357-7016:** *Who u race against?*
>
> **Moore:** *Some boys out of sc they had a good game dog*

f.  I believe the phrases "motor stop" and "motor gave in" in this conversation are code for a dog losing a dogfight. Using the coded language, Moore told the contact that his dog lost. The contact told Moore that he needs to "tune car yourself." I believe

22

the contact was explaining to Moore that he needs to prepare the dog for the fight himself and not rely on others for the "keep" – Moore appeared to agree, stating that he "got 2 pick up on my work game." In addition, Moore told the contact that the winning dog was from South Carolina and will not be able to fight again.

**Moore "Rolls" Dogs at SUBJECT PREMISES**

62.     Photos and videos from Moore's phone show that he "rolled" a dog on December 16, 2019. A chronological breakdown of metadata from still photos the phone leads me to believe that the roll took place at the SUBJECT PREMISES. I know from my training and experience that the most common way a dogfighter tests a particular dog for aggressiveness or propensity to attack another dog is to "roll" the dog. A roll is a dogfight conducted for purposes of game-testing rather than for wagering. Roll fights generally last from five to fifteen minutes, at which point the handlers usually stop the fight. However, roll fights can result in serious injury or death to one or both dogs.

63.     Specifically, on December 16 at 9:06 a.m., a picture was taken using the iPhone that depicts someone wearing gray sweatpants and beige boot-type shoes with the shoe tongue laying down. The picture metadata indicate the photo was captured on Welder Street. Welder Street is a short dead end street with approximately 8 houses, including the SUBJECT PREMISES.



23

64.     Three videos, with no identifiable location metadata, were captured between 9:22 a.m. and 9:27 a.m. on the same date, December 16.

    a.     The first video depicts two pit bull-type dogs engaged in a fight.   A local law enforcement officer familiar with Moore watched the video and confirmed that the voice in the video encouraging the dogs to fight is that of Moore.  A screenshot from the video is below.  Based on knowledge of the area, I believe the video was captured inside the detached concrete garage located on the SUBJECT PREMISES. The video captures a portion of a door that looks very similar to the door on the detached concrete garage.  RCSO also observed several cages positioned in an octagon in the detached concrete garage when they conducted a search warrant of the SUBJECT PREMISES on March 18, 2020.  A screenshot of the video is presented below:



    b.     The second video depicts two pit bull-type dogs engaged in a fight. A local law enforcement officer familiar with Moore watched the video and confirmed that the voice in the video encouraging the dogs to fight is that of Moore.  A screenshot from the video is below. For the reasons stated above, this video also

24

appears to be captured inside the detached concrete garage located on the SUBJECT PREMISES. A screenshot of the video is presented below:



c. A third video depicts Moore showing a bite mark on his leg and saying "that bitch came off the dog and went on my leg..." In the video Moore is wearing grey sweatpants with beige boot-type shoes with the shoe tongue laying down. It appears to be the same clothes as presented in the picture mentioned previously. A screenshot of the video is presented below:



25

65.　At 9:49 am and 9:50 am on the same date, December 16, two pictures were taken that appear to show a puncture wound consistent with a dog bite. The metadata from the two pictures indicate the pictures were taken in the area of Welder Street, the street on which the SUBJECT PREMISES are located.





66.　It is my opinion, based on knowledge of the area through drive-bys and the metadata associated with the photographs before and after the videos, that the roll on December 16, 2019, occurred on the SUBJECT PREMISES.

26

67. Moore sent the three videos associated with the roll to 14043577016@s.whasapp.net using the messaging application WhatsApp. During the WhatsApp conversation on December 16, 2019, Moore and 14043577016@s.whasapp.net discussed how Moore's dog performed in the roll.

> **14043577016@s.whasapp.net:** 😊 *bite people*
>
> **Moore:** *She never has nobody do her like that*
>
> **14043577016@s.whasapp.net:** *Size or age difference?*
>
> **Moore:** *Size other bitch first time she lil bigger then loco girl*
>
> **14043577016@s.whasapp.net:** *Tru*

68. I believe 14043577016@s.whasapp.net and 1-404-357-7016 are the same contact with Moore switching between methods of communication. Throughout my review of Moore's phone, Moore consistently talks with 1-404-357-7016 about dogfighting. Moore and 1-404-357-7016 exchange pedigrees as well as videos and photographs of puppies, adult dogs and dogfights.

**Review of Moore's Public Facebook Page**

69. Moore has a Facebook page that is open to view by other Facebook users. I reviewed Moore's Facebook page on November 10, 2020, and January 4, 2021, and observed several pictures and videos of dogs that appear to be taken at the SUBJECT PREMISES based on my drive-bys of the area.

70. Two videos posted by Moore in October 2020 show a pit bull-type dog biting a rope suspended from a tree and hanging and swinging from the rope. This type of device is called a springpole and is used to condition a dog for fighting by building up his neck and jaw muscles. The following screenshots are from the videos:

27



71.     Moore also posted a screen shot of a dog pedigree and a photograph of several paper pedigrees with the caption "Like a car all my dogs come with a title." Pedigrees are important in the dogfighting industry because they allow dogfighters to maintain information on whether a particular bloodline or breeding combination resulted in desired fighting traits, information that is used when buying and selling dogs, or when hooking dogs for fights. The extraction from Moore's cell phone include conversations in which Moore asked contacts how much a dog cost or provides the price of a dog.     Moore exchanged several pedigrees with contacts with the root http://www.apbt.online-pedigrees.com. Dogfighters use this website as a repository for breeding

28

information to prove, verify, and research the lineage of dogs they are fighting against or considering buying or breeding to.



## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

71.     As noted above, I believe that dog fighters generally, and Delontay Moore specifically, use telephones and electronic media in furtherance of their unlawful dog fighting ventures, and that evidence pertaining to dog fighting will be found on such devices at the SUBJECT PREMISES.

72.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

29

73. *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is

30

typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

74.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

31

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For

32

example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.

33

Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

75. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large

34

volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

76. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

35

## CONCLUSION

77.     Based on the above, I believe there is probable cause to find that violations of 7 U.S.C. § 2156 occurred, and that evidence of such violations (described in Attachment B) will be found at the SUBJECT PREMISES.

78.     Based upon the foregoing, I request that this Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41, to allow the search of the SUBJECT PREMISES more particularly described in Attachment A, and the seizure of the items described in Attachment B. I seek permission to allow USDA to obtain the assistance of Federal, State or local law enforcement authorities, including the U.S. Marshals Service and a contractor utilized by that agency for the handling of seized animals, in handling animals and executing the search of the SUBJECT PREMISES. Permission is also sought to allow these parties to seize items identified in Attachment B as well as to take photographs or video of any location, item, or individual at the search sites, and to establish safety perimeters as government agents deem necessary to accomplish the searches.

79.     Necessary veterinary care shall be provided to any seized animals as required by 7 U.S.C. § 2156(f).

80.     I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

/s/ George Moore
George Moore
Special Agent, USDA

Case 1:21-mj-00057-JLW   Document 1   Filed 02/11/21   Page 37 of 46

Pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the affiant appeared before me via reliable electronic means (telephone), was placed under oath, and attested to the contents of this written affidavit. This the 11th day of February, 2021, at 12:58pm.

JOE L. WEBSTER
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

The place to be searched is 508 Welder Street, East Spencer, North Carolina (SUBJECT PREMISES), further described as a residential property located in Rowan County, North Carolina with parcel identification 026 246. The SUBJECT PREMISES is an off white single story cinder block residential dwelling with the numbers "508" horizontally affixed to the structure just above the front porch. The SUBJECT PREMISES includes an additional garage/building in the rear of the residence. The place to be searched includes any additional structures located on or within the curtilage of the SUBJECT PREMISES and any vehicles present at the SUBJECT PREMISES during the execution of the search warrant. A photograph of the SUBJECT PREMISES is shown below.



Residential Dwelling



Additional Structure located at SUBJECT PREMISES

# ATTACHMENT B

**Items related to be seized related to an Animal Fighting Venture**

Evidence, fruits, and instrumentalities of violations of 7 U.S.C. § 2156, namely:

1.  All live or dead dogs, including puppies born or unborn;

2.  Other animals capable of being used in the dogfighting training process;

3.  All dogfighting paraphernalia, including: treadmills, cat-mills, slat mills, jenny mills, exercise wheels, hides or other material used as hanging devices to strengthen or condition dogs; collars, leashes, chains, and other devices capable of being used to exercise or restrain fighting dogs; wooden sticks or handles capable of being used to pry open dogs' jaws; breeding stands; weight scales; and any washtubs, buckets, pails, and sponges capable of being used to wash dogs;

4.  Any books, magazines, photographs, film, videotapes, or writings that contain material relating to dogfighting, dogfighting training, or pit bull-type dogs; including on electronically stored media;

5.  Any awards, trophies, plaques, or ribbons promoting or relating to dogfighting;

6.  Any film, video or audio recordings, memory cards, or other storage devices capable of recording dogfighting activity; including on electronically stored media;

7.  Animal carrying cases, pens, chains, or leads;

8.  Drugs or supplements capable of being used to treat injured dogs or to enhance their performance; needles and syringes capable of being used for the administration of such drugs; suture or surgical staple kits and other veterinary supplies;

9.      Registration papers or other materials (written or otherwise) showing possession, ownership or transfer of dogs, including bills of sale, pedigrees, breeding records, transport documents, shipping records, certificates, receipts, notes, and veterinary records; including on electronically stored media;

10.      Any documents and records of financial accounts or transactions related to payment for or proceeds from or related to dogs, including account statements, deposits, withdrawals, checks, debits, wire transfers, or other documents; including on electronically stored media;

11.      Any dogfighting records or notes, including names and telephone numbers of persons suspected of being dogfighters; any rules, contracts, training logs, breeding records or other written agreements concerning the fighting of dogs; including on electronically stored media;

12.      Any constructed enclosures or components of any pits or enclosures capable of being used for the purpose of dogfighting, training dogs for fighting, or housing dogs intended to be used for fighting, including any carpeting or other materials used on the floor or walls of such enclosures;

13.      Any dog or other animal carcasses located or buried on the property, or parts or skins thereof;

14.      Any flooring or wall components displaying evidence of blood, fur, or other animal matter;

15.      Any utensils or weapons capable of being utilized in the killing of animals, to include ropes, wire, guns, rifles, spent shotgun shells, spent bullet cartridges; buckets, barrels, or other devices capable of being used to drown dogs; baseball bats, metal pipes, batteries, electrical wires and clips, knives; and barrels, flammable substances, and other items capable of being used to burn live or dead dogs;

16.     Devices capable of being used to deter barking in dogs, including collars, sprays, and sonic emitters;

17.     Deposits of blood, fur, or other animal matter located on the property;

18.     Material (e.g., from buccal (cheek) swabs) for DNA determination from all live dogs for purposes of comparison with other blood/tissue evidence;

19.     Any and all materials reflecting the destruction of evidence at that location, including destroyed, damaged, or tampered with documents, flooring, wall components, or other structures;

20.     Soil, blood, fur, animal skins and vegetation from the property to be used for forensic testing;

21.     Any and all United States Currency found in the same general area totaling over $1,000; and

22.     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence

of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

22.  In order to search for the items described above that may be maintained in electronic media, law enforcement personnel are authorized to search, copy, image and seize the following items for off-site review:

a.  any computer or storage medium capable of being used to commit, further or store evidence of the federal offenses listed above; and

b.  any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer or storage medium;

23.  As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

24.  The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

25.     The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

26.     For purposes of authentication at trial, the Government is authorized to retain a digital copy of all seized information authorized by the Warrant for as long as is necessary for authentication purposes.